George F. Getz, Jr., and Olive A. Getz v. Commissioner.
Getz v. Commissioner
Docket No. 94503.
United States Tax Court
T.C. Memo 1965-110; 1965 Tax Ct. Memo LEXIS 219; 24 T.C.M. (CCH) 580; T.C.M. (RIA) 65110; April 23, 1965
*219 Bona fide sale at fair market value by taxpayer of stock acquired for investment purposes to a family-owned corporation whose regular business was investments in security held not to result in a dividend distribution to taxpayer. Damage during the taxable year to petitioners' residential lake-front property resulting from a combination of unusually high water levels and high wind velocities held deductible as casualty loss. Warren C. Seieroe, for the petitioners. Seymour I. Sherman, for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: In this proceding respondent determined a deficiency in petitioners' income tax for the calendar year 1954 in the *220 amount of $69,116.31. The deficiency results from the addition to income reported of $101,850 said to be the amount of a dividend distribution to petitioners by a family corporation in the guise of a sale of stock to the corporation and the disallowance of a claimed casualty loss deduction of $35,000 from storm damage to petitioners' residential lake-front property. Both adjustments are contested. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife and are residents of Winnetka, Illinois. They filed a joint return for the calendar year 1954 with the district director of internal revenue at Chicago, Illinois. The husband, George F. Getz, Jr., will be referred to at times hereinafter as petitioner. On August 6, 1952, petitioner purchased 600 shares of the common stock of Wonder Rice Mills, Inc., a Texas corporation, at a price of $175 per share. Of the 600 shares so acquired 286 shares were purchased by petitioner for his own account, 143 shares as nominee for his wife, Olive A. Getz, and 57 shares each for Arthur R. Metz, Blanche C. Atwater and Olive C. Sleeper. Blanche C. Atwater and Olive C. Sleeper were, respectively, *221 the mother and aunt of Olive A. Getz. Arthur R. Metz (hereinafter sometimes referred to as "Metz") is not related to petitioner by blood or marriage but has been for many years a close friend of the Getz family. The parties all agreed that the stock would be held by petitioner as a block until sold or otherwise disposed of by him. Wonder Rice Mills, Inc., was incorporated June 16, 1936, as Orange Rice Milling Company, Inc. In February 1948 its name was changed to Adolphus Rice Mills, Inc., and on April 11, 1951, to Wonder Rice Mills, Inc. On July 31, 1954, its name was again changed to Comet Rice Mills. Hereinafter the corporation will generally be referred to as "Comet," irrespective of the period to which reference is made. Comet was the surviving corporation of a merger which took place in July 1952 between a then-existing Comet Rice Mills (hereinafter sometimes referred to as "Old Comet") and Wonder Rice Mills, Inc. At all times here material Comet and its subsidiary corporations were engaged in the milling, storage, preparation, distribution and sale of rice products in the United States and foreign markets and in related activities connected with the rice industry. Comet's *222 history prior to the 1952 merger was as follows: Comet owned a rice milling plant at Orange, Texas, which it operated from 1936 to 1938, and then leased out to others until 1945. In 1945 control of Comet was acquired by Robert B. Holland, Sr. (hereinafter referred to as "Holland"), at which time it again commenced operation of the Orange, Texas, plant, producing bulk clean rice. In January 1948 Comet acquired the physical properties of both Adolphus Rice Milling in Houston, Texas, and Bay City Rice Mills, Inc., in Bay City, Texas. Thereafter, Comet moved its principal place of business to Houston and disposed of its Orange mill. The Houston mill produced bulk rice and also packaged rice, which was marketed under the brand names "Adolphus" and "Peacock." The Bay City mill produced bulk rice. In January 1951 Comet acquired all of the capital stock of Walton Rice Mill, Inc., which operated a rice mill in Stuttgart, Arkansas, and also owned all of the outstanding stock of Commercial Processing and Storage Company, which had been organized to erect a plant for processing parboiled rice. In 1951 Comet formed subsidiaries to construct and operate a rice oil plant and a storage warehouse. *223 Old Comet's history prior to the 1952 merger was as follows: Old Comet was incorporated in 1902 under the laws of Texas as Seaboard Rice Milling Company. In 1925 the name was changed to Comet Rice Company and in 1927 it commenced marketing packaged rice under the brand name "Comet." Old Comet merged with Steinhagen Rice Milling Company in 1939 and moved its operations to the Steinhagen plant in Beaumont, Texas, thereafter engaging solely in the milling of rice for package distribution. In 1950 Old Comet acquired all of the outstanding stock of Mouton Rice Milling Company, which operated a milling plant at Harrisburg, Arkansas. On June 30, 1952, Comet acquired all of the outstanding stock of Old Comet from Gulf Coast Rice Farms, Inc., a corporation controlled by Holland. Old Comet was then merged into Comet. Shortly after July 31, 1953, a wholly-owned subsidiary of Comet sold its New Orleans milling facilities to two insurance companies for $375,000 and leased the property back under a lease which provided for an annual rental of $86,000 for five years commencing September 1, 1953, and an annual rental of $5,800 during each of nine five-year renewal periods. On July 31, 1954, Comet's *224 corporate structure was reorganized to eliminate many of the subsidiary companies. Following the reorganization, the surviving corporations and their activities were as follows: (a) Comet, the parent company, directly owned and operated all manufacturing facilities in Texas; (b) Delta-Comet Rice Mills, Inc., a wholly-owned subsidiary of Comet, owned or leased and operated manufacturing facilities in Arkansas and Louisiana; (c) Comet Rice Company, a wholly-owned subsidiary of Comet, handled sales of rice from outside warehouses; (d) Comet Rice Export Corporation, a wholly-owned subsidiary of Comet, was a Western Hemisphere trading corporation. (e) Comet Rice Mills of Louisiana, Inc., a wholly-owned subsidiary of Comet, was inactive; and (f) Adolphus Rice Milling Company, a wholly-owned subsidiary of Comet, was inactive. Following the 1952 merger, Comet's authorized capital consisted of 12,000 shares of $100 par value common stock. Pursuant to resolutions adopted at special meetings of its stockholders and board of directors on December 5, 1952, the following changes were authorized in Comet's capital structure: (a) Its authorized common stock was changed from 12,000 *225 shares of $100 par value per share to 712,000 shares of $2 par value per share; (b) It authorized 10,000 shares of $6 cumulative preferred stock without par value and redeemable at $100 per share; and (c) It authorized $2,400,000 first mortgage 5 1/2 percent sinking fund bonds due August 1, 1964. On December 8, 1952, or shortly thereafter (but all within its fiscal year ended July 31, 1953) the following changes were made in Comet's capital structure: (a) 600,000 shares of $2 par value common stock were issued to the holders of the 12,000 shares of $100 par value common stock in exchange for the old shares on a 50-for-1 basis; (b) 10,000 shares of $6 cumulative preferred stock were issued to Investors Diversified Services, Inc. (hereinafter sometimes called "I.D.S.") at a price of $98.86, and as part of the same transaction the purchaser was given warrants entitling it to purchase 40,000 shares of $2 par value common stock at $4 per share at any time between January 1, 1953, and January 1, 1963; and (c) $2,400,000 face value first mortgage 5 1/2 percent sinking fund bonds were sold to various institutional investors at $95 for each $100 of face, and as part of the same *226 transaction the purchasers bought for $4 per share three shares of $2 par value common stock of Comet for each $100 face value bonds purchased, or a total unit price of $107. Subsequently, Comet reacquired the bonds purchased by one of the institutional investors, Southland Life Insurance Company, and, as part of such reacquisition, Southland surrendered to Comet for no additional consideration 8,350 shares received by it in connection with its purchase of bonds. Comet thereafter held the reacquired shares as treasury stock. None of the warrants issued to the purchaser of the preferred stock (I.D.S.) had been exercised as of July 31, 1960. At January 31, 1954, Comet's authorized stock consisted of 712,000 shares of $2 par value common stock and 10,000 preferred shares of no par value. Of the common stock, 663,650 were issued and outstanding and 48,350 shares were held as treasury stock. Of the preferred shares, 9,675 were outstanding and 325 were held as treasury stock. After the change in Comet's capital stock authorized December 5, 1952, and the resulting 50-for-1 split of its common shares, the 600 shares held by the petitioner were exchanged for 30,000 new shares. The new *227 shares, therefore, had a cost basis to their respective owners of $3.50 per share. On June 12, 1953, petitioner purchased for his own account from Robert B. Holland, Sr., 12,500 shares of Comet common stock at a price of $4 per share. Holland was at that time president and controlling stockholder of Comet. At the same time, petitioner made Holland a cash loan of $50,000 payable in six monthly installments beginning June 12, 1956, with interest at 4 1/2 percent. As a part of the transaction, petitioner gave Holland an option to repurchase the 12,500 Comet shares before June 22, 1956, at the market value on June 12, 1956, and Holland agreed to refund to petitioner a part of his purchase price of the shares if their market value (with certain specified adjustments) on June 12, 1956, was less than $56,750, or $4.54 per share. It was on Holland's recommendation that petitioner made his original investment in the Comet stock. Later he and petitioner become associated in a number of business ventures. On April 8, 1954, petitioner sold the 42,500 shares of Comet stock which he held for himself and his nominees to Globe Corporation (hereinafter sometimes referred to as "Globe") at a price *228 of $6 per share. The conditions of the purchase and sale agreement between petitioner and Holland, such as the guarantee against loss and petitioner and Holland's conditional reacquisition rights, carried over to the transfer of the shares by petitioner to Globe. Globe was a Getz family corporation organized in 1901. Its stock issued and outstanding at April 8, 1954, consisted of 28,603 common shares of a par value of $50 each held as follows: Number
Shareholder
of Shares
Petitioner
19,677
George F. Getz, Jr., as Trustee under
Agreement dated December 20, 1935,
f.b.o. George F. Getz, III (son of
petitioners herein)
500
George F. Getz, Jr., as Trustee under
Agreement dated December 20, 1935,
f.b.o. Bert A. Getz (son of petitioners
herein)
500
George F. Getz, Jr., James R. Getz,
and Arthur R. Metz, Trustees of
George F. Getz, Jr., Trust f.b.o.
George F. Getz, Jr.
6,741
Bert A. Getz
550
George F. Getz, III
550
Olive A. Getz
85
Total
28,603 There were also 2,752 treasury-held shares. Globe's officers were: George F. Getz, Jr. (petitioner), president Arthur F. Schuck, executive vice president Gordon L. Murray, vice president and controller
*229 John A. Sandstrom, secretary and treasurer W. S. McAdoo, assistant secretary The directors of Globe were petitioner, his wife, James R. Getz, Arthur R. Metz, and Arthur F. Schuck. Globe's activities in 1954 were widely diversified. They included manufacturing, real estate operations and security investments. Globe's income tax returns for the years 1947 to 1954, inclusive, show net income and losses, and earned surplus and undivided profits (ESUP) as follows: Year
Income (Loss)
ESUP
1947
[97,201.70)
$ 913,423.72
1948
125,594.92
945,157.02
1949
28,784.06
1,112,990.64
1950
211,826.20
1,309,528.69
1951
391,550.74
1,479,614.84
1952
302,503.43
815,642.42 *
1953
161,706.24
1,062,241.70
1954
118,983.50
1,283,964.40
Globe's directors each year appointed a "finance committee" whose duties were to investigate and pass on Globe's investments and to exercise general control of its corporate funds. They also advised petitioner on personal investments including his purchase of the *230 Comet stock. Globe's finance committee in 1954 consisted of petitioner, Schuck, Gordon L. Murray, and John A. Sandstrom. In preparation for his sale of his Comet shares to Globe, petitioner instructed Schuck, as a member of the finance committee, to make a study and determine the fair market value of the stock. In making this study, Schuck consulted with Comet officials and made an analysis of Comet's earnings and position in the industry. Schuck was at that time also a member of Comet's board of directors. After its investigation, the finance committee reported to petitioner that $6 a share was a fair market value for the stock. Comet's shares were not listed for trading on any security exchange. As it was construed in 1954, Comet was an amalgamation of a number of rice-producing and related businesses, ranking about third in size in the industry in the United States. In 1954 Comet produced 5,200,000 barrels of the total United States production of 69,000,000 barrels of cleaned rice. Its chief function consisted of purchasing "rough" rice from the growers, processing it through its mill operations and selling it to the public. About 65 percent of Comet's sales in 1951 were in *231 bulk and 35 percent in packaged goods. The proportion of bulk to packaged sales fluctuated somewhat from year to year. Prior to World War II about 95 percent of the world supply of rice was produced in the Far East. Since 1941 production in the Western Hemisphere greatly increased, with the United States and Brazil being the major producers. Owing to the comparatively small per capita consumption of rice in the United States, about five pounds per annum, a large portion of the domestic production goes into export trade. The price of rice approximately trebled in the world market from the beginning of World War II to 1950. Comet kept its books and prepared its financial reports on the basis of a fiscal year ending July 31. Its profit and loss statements and balance sheets show gross income, net income after taxes, and accumulated earnings, for the fiscal years ended July 31, 1953 to 1956, inclusive, and for the six months ended July 31, 1954, as follows: Year Ending
Gross Profit
Accumulated
July 31,
from Operations
Net Income
Earnings
1953
$4,624,292
$645,517
$2,086,755
1954
3,949,447
143,228
2,213,458
1955
5,419,218
658,848
2,764,756
1956
4,478,932
447,452
3,108,210
6 months ending 1-31-54
2,711,196
326,445
2,383,697
*232 For the seven-month period ended February 28, 1954, net profits were $390,648 against profits of $468,679 for the same period in 1953. The harvesting and marketing season for rice usually begins in August. Early in the 1953 and 1954 crop year, as was customary, Comet purchased in excess of its actual contractual requirements. Then, as the marketing season progressed, rice prices declined substantially, contrary to the usual situation, leaving Comet with an overpriced inventory and increasing book loss. In an effort to counteract the decline in price and loss of sales, Comet reduced its operating expenses by approximately $800,000 and was able to show a small net profit for the year ended July 31, 1954. On January 31, 1954, Comet had outstanding 663,650 common shares held by 29 different stockholders including several insurance companies and other institutional investors. There were also 48,350 shares held as treasury stock. Holland was the largest stockholder with 152,150 shares. His son owned 92,175 shares. The book value of Comet's common shares on the dates shown was as follows: 7-31-52
7-31-53
2-28-54
7-31-54
7-31-55
7-31-56
$4.28
$5.60
$6.13
$5.74
$6.63
$7.11
*233 The only purchases and sales of common stock between the dates January 31, 1954, and August 1, 1955, other than the sale of the 42,500 shares by petitioner on April 8, 1954, were the purchase by Holland of 850 from Comet on October 16, 1954, at $6 per share, the purchase by George F. Scanlon (hereinafter sometimes referred to as "Scanlon") from Holland on October 27, 1954, of 1,000 shares at a price of $6 per share and the purchase by Holland from Charles M. Horth on January 17, 1955, of 2,500 shares at $6 per share. On October 16, 1954, Comet authorized the transfer to three of its officers as a bonus of 2,500 shares each of its common stock at a value of $6 per share, as determined by Comet's board of directors. Scanlon was a man of wide experience in securities investments. At the time of his purchase of Comet stock from Holland, he was a director of Comet and was a major stockholder of Godchaux Sugars, Inc. A controlling interest in Godchaux Sugars, Inc., was acquired in August 1954 by the same group that controlled Comet. Petitioner invested approximately $400,000 and became a director of the company. Horth was executive vice president and a director of Comet. He was chiefly *234 responsible for the $6 per share valuation which the finance committee made. He himself reported income from receipt of the bonus shares of $15,000 in his 1954 return. In 1954 a plan was under discussion, being promulgated by Holland, for the merger of Comet with several other food processing and distributing corporations, including Godchaux Sugars, Inc. These plans were all abandoned after Holland's death. There were a number of sales of Comet's common shares between May 19, 1956, and April 19, 1957, at a price of around $3 per share. There were two sales in April 1957 at $2.75 per share. In his deficiency notice, the respondent determined the fair market value of Comet's common stock on April 8, 1954, to have been $3 per share and that the excess received over that amount constituted the receipt of a dividend. The fair market value of the stock on that date was $6 per share. Petitioners purchased their residence at Winnetka, Illinois, in September 1944. Their original cost and subsequent capital improvements as of December 31, 1953, were as follows: Original Cost
$83,598.71
Add Capital Improvements: Taxpayers' share of cost of concrete groin
$9,701.60
Special assessment
252.22
Trees and bushes
1,436.29
11,390.11
$94,988.82
Less: Casualty loss allowed 1952
20,000.00
Adjusted basis December 31, 1953
$74,988.82
*235 The main residence was built about 1900. The property was described in a real estate listing in 1954 as follows: STRUCTURE: Lovely rambling cement house. 1st floor: Reception hall with black and white marble floor, large living room, billiard room (tile floor), dining room, breakfast room, all overlooking the lake and have huge picture windows. Game or trophy room with marble fireplace and half circle bar. (Figures built into front of the bar not included and winddial on roof not included). Large library, powder room, butler's pantry with steel cabinets, dishwasher. Steel cabinet kitchen with disposal. Servant's dining room, screen porch for servants. Stone terrace facing the lake and a screen porch with awning top. 2nd floor: 5 master bedrooms, mirrored dressing room adjoining owners suite, 5 tile baths (2 have shower stalls). Fireplace in guest room, cedar closet. 3rd floor: 4 nice servant's rooms and bath. Basement: 3 porcelain tubs, gas dryer. HEAT: Gas. Bryant boiler. Entire heating system is new. * * * GARAGE: 3 car detached, 5 room apartment above. Separate heating plant with gas. * * *
REMARKS: All utilities are run underground to the house. Automatic *236 switchboard has four Winnetka lines and one Chicago line and intercommunicating system. * * * Damage to property fronting on Lake Michigan is likely to occur when there is a combination of water levels in the lake in excess of 581 feet above sea level and winds of 25 miles per hour or greater velocity. Such conditions existed from time to time during the years 1951 to 1954, inclusive, and also in June and February 1955. In 1952 the water level reached a peak of nearly 583 feet above sea level and remained high during 1953 and 1954. Previously, in 1950, the water levels had been as low as 579 feet and after 1954 it reached a low of 578 feet. Considerable damage to petitioner's property from high water and wind storms occurred in 1952. On September 3, 1953, a real estate agent with whom petitioner had listed the property in question for sale wrote petitioner as follows: In looking over your 365 Sheridan Road, Winnetka, Illinois, property recently, for which you have from time to time sought a prospective buyer, I particularly noticed the damage that the storm of the Fall, 1952 did to your bluff. I am of the opinion that this damage, from a sales standpoint, would reduce the sales *237 value of this property by approximately $20,000.00 Because of the damage, not only to your property, but to other riparian rights property in the vicinity, people who were formerly interested have shied off completely. While the reduction in value arising from the damage could easily be from $30,000 to $40,000, I do not believe that we could actually deduct that much from the sales price. A reduction of $20,000 would be very reasonable. During October 1954 there were several severe wind storms with northeast winds of high velocity which caused heavy damage to lake-front properties in the Winnetka area. The combination of wind and high water undermined the bluff along a portion of petitioners' property causing the collapse of the tablelands and the loss of many trees and shrubs. Since the purchase of the property in question, petitioner has engaged "The Davey Tree Expert Co." to care for the trees and grounds. The district manager of the company wrote to the petitioner on April 6, 1955, as follows: I checked the situation along the lake bank at your residence yesterday with a view to determining a fair estimate of the damage which has occurred to the trees, evergreens, and shrubbery. *238 Since I last made a survey here in 1953, it would appear that a substantial amount of the bank has collapsed with a resultant loss of many valuable trees. The following list is, I believe, quite accurate on the loss which has been sustained: three large Poplars, one large Honey Locust, seven Box Elders, two large Willows, one Mulberry, one Black Locust, one Ash, eight large Spruce trees, three Pfitzer Junipers, and 12 large Honeysuckle shrubs. On the larger trees it would be quite impossible to replace them with trees of similar size, but figuring a reasonable price to replace all of these casualties in sizes which could be safely transplanted, I would say that a fair estimate would be about $11,500 to $12,000. If you require additional information I would be pleased to furnish it if possible. Some of the lost trees on petitioner's property were 24 inches or more in diameter. The trees to which the cost estimate related were not more than 12 inches in diameter. In their return for 1954, petitioners claimed a casualty loss to their property of $35,000 due to the lake storms. The deduction was disallowed in its entirety by respondent. Petitioners sustained a loss from damage *239 to their lake-front property in 1954 caused by high winds and high water levels on Lake Michigan of at least $25,000. Opinion Dividend Distribution In support of his determination of a value of $3 per share for the Comet stock on April 8, 1954, respondent places chief reliance on the purchase of the shares by petitioner for $3.50 per share on August 12, 1952, and for $4.50 per share on June 12, 1953, and the deterioration of Comet's profit outlook early in 1954. He attributes a setback in value from $4.50 per share at June 12, 1953, to $3 per share April 8, 1954, largely to the interim decline in Comet's net income. In substantiation of their valuation of $6 per share petitioners rely on a valuation of the stock which they made at the time of its transfer to Globe and subsequent sales of the stock at or above that price. Both parties offered the testimony of expert witnesses. Respondent seeks to discredit the testimony of petitioners' witnesses for a number of reasons, including noncomparability of the other rice milling companies used for comparative purposes. Petitioners, in turn, are equally critical of the testimony of the respondent's expert witness and his selection *240 of comparative companies. Respondent's own expert witness gave it as his opinion that the Comet shares at April 8, 1954, had a fair market value of $4.25 per share instead of $3, as respondent had determined. It was not explained exactly how the $4.25 figure was derived, and the evidence contains little support for respondent's valuation of $3 per share other than the sales of the stock as hereinafter described. In our consideration of the question, we have given credence to petitioner's testimony that he intended to sell the Comet stock to Globe at its fair market value. It seems to us, too, that he took reasonable steps to ascertain its fair market value when he turned the matter over to Globe's finance committee. The committee's valuation of $6 per share was made after investigation of Comet's business and consultation with Comet's officers. We cannot assume that the several members of the finance committee acted in disregard of their responsibilities in the matter or that they were in conspiracy with petitioner to obtain for himself a tax benefit from a disguished dividend distribution from Globe. To the contrary, the evidence convinces us that both petitioner and the finance *241 committee acted in good faith and without any purpose of effecting a dividend distribution to petitioner. In Palmer v. Commissioner, 302 U.S. 63 (1937), the Supreme Court of the United States held that a transaction such as the one under consideration does not give rise to a dividend distribution unless it is in purpose or effect used as an implement for the distribution of a dividend. Of even more weight in the matter of valuation, we think, are the several other purchases of Comet's stock by other individuals at the price of $6 per share within the same year and soon thereafter. These were the purchase at $6 per share of 850 shares by Holland from Comet October 16, 1954, the purchase at $6 per share of 2,500 shares by Holland from Horth on January 17, 1955. While the parties to these purchases and sales were for the most part business associates or acquaintances and were all somewhat familiar with Comet's affairs, the transactions were in no way related to petitioner's transfer of his shares to Globe. None of the other parties who joined with petitioners in the purchase *242 of the Comet shares on August 6, 1952, owned any interest in Globe. They were all independently wealthy and in no need of financial assistance from petitioner. Previously, petitioner had advised and assisted them in some of their investments and business affairs. There is no apparent reason why Globe might have been willing to pay them more than fair market value for their Comet shares. Holland's death on April 24, 1955, had a serious adverse affect on Comet's affairs. Its organization was disrupted and the plans for its merger with other companies was abandoned. Most of its experienced officers left the company. However, even after Holland's death, and in October 1956, his estate had an offer from Continental Grain Company to purchase a controlling interest in Comet at $7 per share for its common stock. The offer was declined. Based on the evidence as a whole, we have found, as petitioners contend, that the Comet common stock had a value on April 8, 1954, of not less than $6 per share. Casualty Loss The disallowance of the casualty loss deduction claimed by petitioners in their 1954 return is not explained in respondent's notice of deficiency other than "you have not established *243 that you are entitled to such a deduction." In his brief, respondent takes the position that the loss, if any, was not a casualty loss within the meaning of the statute, section 165(c)(3), Internal Revenue Code of 1954 (section 23(e)(3), 1939 Code), and in any event was of a much less amount than claimed. Petitioners concede that the extent of the 1954 loss was only $25,000 instead of $35,000 as claimed in their return. Respondent contends that the damage to the petitioners' property in 1954 was caused by a gradual erosion extending over a considerable period of time and was not from any sudden, well-defined storm, which may be characterized as a "casualty," as that term is used in the statute. The line of demarcation between "casualty" losses, within the intentment of the statute, and losses due to gradual deterioration is not very clearly defined. Generally, the proof required to establish a casualty loss is that the loss resulted from some sudden and unexpected event. In Ray Durden, 3 T.C. 1, 3 (1944), we said that: Under the doctrine of ejusdem *244 generis, it is necessary to define the word "casualty" in connection with the words "fires, storms, shipwreck" immediately preceding it. "Casualty" has been variously defined, including "an undesigned, sudden and unexpected event" - Webster's New International Dictionary; also as "an event due to some sudden, unexpected or unusual cause" - Matheson v. Commissioner, 54 Fed. (2d) 537. The term "casualty" "excludes the progressive deterioration of property through a steadily operating cause." Fay v. Helvering, 120 Fed. (2d) 253; also, "an accident or casualty proceeds from an unknown cause or is an unusual effect of a known cause. Either may be said to occur by chance and unexpectedly." Chicago, St. Louis & New Orleans Railroad Co. v. Pullman Southern Car Co., 139 U.S. 79. * * * See also, James M. Kemper, 30 T.C. 546 (1958), affd. 269 F. 2d 184 (C.A. 8, 1959); William J. Matheson, 18 B.T.A. 674 (1930), affd. 54 F. 2d 537 (C.A. 2, 1931); and Keenan v. Bowers, 91 F. Supp. 771 (C.A.D.C., 1950). Unquestionably, as respondent inferentially concedes, petitioners' loss would *245 be deductible if it had resulted from a single identifiable storm, whether the damage was caused by high wind, high water, or the combination of both. Under respondent's theory, petitioners' margin of recovery becomes progressively narrowed as the duration of the storm is lengthened or as the number of storms which occasion the loss and the interval between them are increased. Petitioners have not undertaken to relate the loss here to any single occurrence or any specific point of time. They allege in their petition that "During the latter part of 1954 a series of severe storms occurred on Lake Michigan producing violent wave actions which inflicted extensive damage to shore line properties including petitioners' residence." Petitioner's testimony was, in part, as follows: Q. Would you describe the storms that occurred during 1954 and the effects of the storms on the bluff? A. There were several very heavy northeast storms. Oh, I would judge around the middle or latter part of October of 1954, causing very heavy waves, very heavy seas coming in from the northeast. Petitioner's Davey Tree Expert Co. witness testified that he had inspected petitioner's premises in 1953 and again *246 in 1955 and he identified a list that he had made in 1955 of the trees and shrubs that had been lost during the interim. There were photographs taken showing damages caused sometime between the spring of 1953 and the spring of 1955. Respondent's valuation engineer who prepared a report on the storm damage to petitioner's property testified that he had examined the property in 1959 and concluded that the damage did not all occur at one time. He further testified that the conditions which ordinarily give rise to storm damage to lakefront property in the Winnetka area, that is, the water level of at least 581 feet above sea level and a northeast wind of high velocity, all occurred during the months of January, February, March, April, June, October, November, and December of 1954. He further testified, nevertheless, that in his report in connection with petitioners' 1954 return he recommended a casualty loss deduction, but in a lesser amount than claimed by petitioners, of $9,376.82. His estimate was based on a valuation of petitioners' property, as a unit, of $125,000 prior to October 1951, reduced by the interim casualty losses, and a value of $95,000 at December 31, 1954. *247 Losses resulting from high water levels and winds on the Great Lakes were dealt with in Rev. Rul. 79, C.B. 1953-1, 41, 42, which is, in part, as follows: The above and similar provisions [the reference is to section 23(e)(3), I.R.C. 1939] have been in the Federal income tax laws for many years. Court decisions and Bureau rulings have established standards for their application and have developed the overall concept that the term "casualty" as used in such provisions refers to an identifiable event of a sudden, unexpected, or unusual nature and that damage or loss resulting from progressive deterioration of property through a steadily operating cause would not constitute a casualty loss. (See Hugh M. Matheson et al. v. Commissioner, 54 Fed. (2d) 537, Ct. D. 510, C.B. XI-2, 392 (1932); Charles J. Fay v. Helvering, 120 Fed. (2d) 253; and Ray Durden v. Commissioner, 3 T.C. 1.) * * *
Accordingly, losses due to physical damage to buildings, boathouses, docks, seawalls, etc., on the Great Lakes as a result of their being battered by wave action and wind during a storm are deductible *248 as casualty losses under section 23(e)(3) of the Code, supra. Likewise, the flooding of buildings and basements as a result of storms and the complete destruction of buildings, occurring as a result of storm damage, will also constitute deductible casualty losses. However, there are areas in which some damage or expenditure may be incurred due to high water on the Great Lakes which may not be considered as casualty losses under the Internal Revenue Code. One situation is damage or loss of value due to gradual erosion or inundation occurring at still water levels. The rise and fall of water levels of the Great Lakes (and of other bodies of water) is a normal process, and damage resulting from high water levels alone lacks the characteristics of a casualty loss under the Code. Thus, where the taxpayer's loss was due to progressive deterioration rather than some sudden, unexpected, or unusual cause, such loss does not constitute a deductible casualty loss for Federal income tax purposes. In so far as has been shown, this ruling has not been reversed or changed to date. The evidence contains *249 no information as to what losses similar to the one here involved have ben allowed to other taxpayers in the Great Lakes area. It is well established by the evidence that petitioners' property did suffer considerable damage from one or more storms occurring in the latter part of 1954. There is no contradiction of petitioner's testimony that the damage occurred about the middle or last of October. We are referred to no case, and can find none, limiting recovery of casualty losses from storms to damage resulting from a single storm of any particular duration. In a literal view of the statute, the damage from two or more storms within the same year might be said to give rise to separate casualty losses as determined after each such storm. However, we do not construe the statute as requiring such particularity and as prohibiting lumping of the damage from two or more storms within the taxable year. On the basis of our finding, well supported by the evidence, that there was damage to petitioners' property about the month of October 1954 due to one or more storms which caused an undermining of its lake-front property and the loss of valuable trees and shrubs in the amount of not less *250 than $25,000, we are satisfied that petitioners have sustained their burden of proof in respect of a deduction of that amount as a casualty loss. Decision will be entered under Rule 50. Footnotes
*. Reduction from prior year effected by retransfer to capital surplus of $656,289.50 with respect to dividends of earlier years charged to capital surplus.↩